**SIGNED THIS: January 20, 2010**

_____
**WILLIAM V. ALTENBERGER
UNITED STATES BANKRUPTCY JUDGE**
_____

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **PATRIOT SEEDS INCORPORATED,** | ) | **No. 03-84217** |
| | ) | |
| Debtor. | ) | |
| ——————————————————— | ) | |
| | ) | |
| **RICHARD BARBER, not personally, but as Chapter 7 Trustee for Patriot Seeds, Inc.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **Adv. No. 03-8290** |
| | ) | |
| **IVAN MURPHY,** | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |
| | ) | |
| **RICHARD BARBER, not personally, but as Chapter 7 Trustee for Patriot Seeds, Inc.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **Adv. No.  04-8206** |
| | ) | |
| **RODNEY ROTHERT,** | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

**RICHARD BARBER, not personally, but as**　　　　)
**Chapter 7 Trustee for Patriot Seeds, Inc.,**　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　**Plaintiff,**　　)
　　　　vs.　　　　　　　　　　　　　　　　)　　　**Adv. No. 04-8363**
　　　　　　　　　　　　　　　　　　　　　　　　　　)
**JACK BIMA,**　　　　　　　　　　　　　　)
　　　　　　　　　　　　**Defendant.**　　)
_____)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
**RICHARD BARBER, not personally, but as**　　　　)
**Chapter 7 Trustee for Patriot Seeds, Inc.,**　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　**Plaintiff,**　　)
　　　　vs.　　　　　　　　　　　　　　　　)　　　**Adv. No.  04-8373**
　　　　　　　　　　　　　　　　　　　　　　　　　　)
**RICH GASTLER and DAVID CHENEY,**　　　　)
　　　　　　　　　　　　**Defendants.**　　)
_____)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
**RICHARD BARBER, not personally, but as**　　　　)
**Chapter 7 Trustee for Patriot Seeds, Inc.,**　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　**Plaintiff,**　　)
　　　　vs.　　　　　　　　　　　　　　　　)　　　**Adv. No. 04-8375**
　　　　　　　　　　　　　　　　　　　　　　　　　　)
**KENT GUYMON, LANDEN GUYMON and**　　　　)
**LESLIE SMITH,**　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　**Defendants.**　　)

## O P I N I O N

These five adversary proceedings are before the Court for decision after a consolidated trial

on the adversary complaints filed by the Chapter 7 Trustee, Richard Barber (Trustee), against the

Defendants, Ivan Murphy, Rodney Rothert, Jack Bima, Rich Gastler, David Cheney , Kent Guymon,

Landen Guymon, and Leslie Smith (collectively, Defendants) pursuant to § 547 of the Bankruptcy

Code, to recover allegedly preferential payments made by the Debtor, Patriot Seeds, Incorporated

(Debtor), to the Defendants.[1]

---

[1]Specifically, the Trustee seeks to recover preferential transfers from the Defendants in the following amounts:  $255,570.44 from Ivan Murphy, $161,671.19 from Rodney Rothert, $61,009.88 from David Cheney, $96,580.45 from Rich Gastler, $16,386.98 from Jack Bima, $54,020.71 from Kent Guymon, $5,142.67 from Landen Guymon, and $4,760.30 from Leslie Smith.

The basic facts giving rise to these adversaries are not disputed.  Prior to filing Bankruptcy, the Debtor was in the business of producing seed corn and seed beans for sale to farmers for planting.  With respect to the seed beans, the Debtor had a contract to produce "Round Up Ready" soybean seed with Monsanto Chemical Company, the holder of the patent.  The Debtor in turn contracted with the above-named Defendants, who are farmers and others entitled to payment under the various contracts, to grow the seed beans for sale to the Debtor, who in turn would sell the seed beans to other farmers for production of soybean crops.  Several of the Defendants had been growing seed beans for the Debtor for several years before the crop year at issue in these adversary proceedings.

Prior to the 2002 crop year, the procedure the Debtor and the Defendants utilized was as follows.  In the fall of the year preceding the applicable crop year or early into the crop year, the Defendants would purchase from the Debtor the soybean seed from which to grow the new seed beans.  In the spring of the crop year, the Debtor and the Defendants would enter into contracts for the growing of the seed beans for that crop year.  All of the contracts were either speculative or non-speculative.[2]  In the fall of the crop year, as the seed beans were harvested, the Defendants would have them weighed and delivered to the Debtor's facility, where they were stored in segregated bins and tested.  The scale operator would issue a scale ticket and the Debtor would issue a receipt entitled "Patriot Warehouse Receipt."  The Defendants would provide seed bean samples to the Debtor for quality testing to determine if the seed beans met prescribed standards.  After performing the tests, the Debtor would send the Defendants a letter indicating whether the seed beans met prescribed standards.  If the tests confirmed the seed beans met prescribed standards, the seed beans

---

[2]The main difference between the speculative and the non-speculative agreements is that under the non-speculative (or regular) contract, if the seed beans were unused, the grower would still be entitled to a 25¢ per bushel payment, known as the "unused bushel premium."  Under the speculative contract, the grower was not entitled to any premium for unused seed beans.  Also, under the regular contract the grower could price the seed beans before delivery to the Debtor, while under the speculative contract, the grower could only establish the price after delivery of the seed beans to the Debtor.  In most instances, these differences are not pertinent to the issues before the Court, and the Court will refer to the contracts generally.  Where the distinctions between the two types of contracts are relevant, such distinction will be noted.

could be priced by the Defendants and purchased by the Debtor.  If the seed beans did not meet prescribed standards, the seed beans could be rejected by the Debtor.

If the Defendants priced their seed beans on or before the first of May, the contracts provided that payment was to be made within seven days after the first Monday in May.  If the seed beans were priced after the first of May, then payment would be made within ten business days after the price was established.  Once the Defendants priced their seed beans, the Debtor would send the Defendants a document entitled "Seed Grower Pricing Confirmation" showing, among other things, the variety of seed beans, the contract number, the number of bushels priced, and the price.  In conjunction with payment to the Defendants, the Debtor would send the Defendants a document entitled "Seed Grower Settlement Statement" containing payment information arranged by contract number and variety grown, including the number of contracted bushels, the number of delivered bushels, the dates priced, the number of bags produced, the amount of bushels that were unused as seed beans, any applicable premiums awarded, and the amounts paid by the Debtor to the Defendants.  The Debtor would finance the payments to the Defendants by a line of credit from the Lincoln State Bank.

The procedure for the 2002 crop year, which is the crop year giving rise to this litigation, was slightly different.  The difference arose because the Debtor switched its financing from the Lincoln State Bank to the John Deere Farm Plan Credit Program ("Farm Plan").  On May 16, 2003, the Debtor sent the Defendants a letter advising them of the switch and that the date of payment would be extended to an estimated date of June 10th, along with 1% interest "to compensate for the delay in payment."  The Debtor held a meeting at a local hotel to discuss the delayed payment issue with its growers that was attended by some of the Defendants.  None of the Defendants opposed the

4

delayed payment, nor did they try to recover the seed beans or sue for the contract price. Checks were issued on or after June 9, 2003.[3]

On September 4, 2003, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On March 16, 2004, the case was converted to one under Chapter 7, and Richard Barber was appointed as the Chapter 7 Trustee for the case. The Trustee commenced the instant adversary proceedings against the Defendants under § 547(b) of the Bankruptcy Code alleging the delayed 2003 payments were preferences.[4] In response, the Defendants denied the existence of a preference and raised the affirmative defenses under § 547(c) that the delayed payments were in the ordinary course of business or were a contemporaneous exchange for new value and therefore were not avoidable as preferential transfers. *See* 11 U.S.C. § 547(b) and (c).

The issues before this Court involve both § 547(b) and (c). While the parties have raised typical preference issues under § 547(b) and (c), these cases are somewhat complicated by the fact that the parties have fundamentally different understandings of the contract provisions and the way the Defendants' relationship with the Debtor was structured. As a result, in addition to addressing the standard preference issues, this Court must also address the parties' divergent positions in order to fully address all the issues raised. In this Opinion, the Court will address the arguments as they have been made by the parties while keeping the fundamental concepts of § 547(b) and (c) at the forefront.

---

[3]The procedures followed and the forms used were the same for all the Defendants. The differences are in the specifics. Accordingly, this Court has set forth the specifics as to each individual Defendant in three Appendices attached to this Opinion. Appendix A sets forth the specifics of each of the contracts the Debtor had with the Defendants for crop year 2002. Appendix B sets forth information showing the number of bushels contracted, the number of bushels delivered, the date delivered, and the number of bushels that were unused. Appendix C contains information showing when each of the Defendants priced their seed beans, the prices set for each variety, and the date the offer to sell was accepted by the Debtor.

[4]It should be noted that in Barber v. Murphy, Adv. No. 03-8290, the Trustee also sought to recover a preferential payment made for seed corn. This count was settled prior to trial. Additionally, in Barber v. Gastler, et al., Adv. No. 04-8373, the Trustee sought to recover a preferential payment made for seed beans from Balke Agriservice. This count was also settled prior to trial.

This Court will first address the issues under § 547(b), which provides that, subject to certain exceptions, a trustee may avoid any transfer of an interest of a debtor in property –

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made –
   (A) on or within 90 days before the date of the filing of the petition; or
   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if –
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by [the Code].

11 U.S.C. § 547(b). Pursuant to § 547(g) of the Bankruptcy Code, the Trustee has the burden of proof on these elements. *In re Jones*, 226 F.3d 917, 921 (7th Cir. 2000). Of these elements, two are contested by the Defendants: (1) was there an antecedent debt and (2) was there a transfer of property of the Debtor's estate?[5]

The term "antecedent debt" is not defined by the Code. However, the term "debt" is defined as a "liability on a claim." 11 U.S.C. § 101(12). The Code defines "claim" as "any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5). A debt is "antecedent" for purposes of § 547(b) if it was incurred before the debtor made

---

[5]The Defendants also initially raised an issue under § 547(b)(3) regarding whether the Debtor was insolvent at the time of the transfers. Two days before trial, the Defendants filed a motion to bar the Trustee from relying on the insolvency presumption contained in § 547(f); however, the Defendants orally withdrew their motion on the morning of trial. In their post-trial briefs, the Defendants do not raise any arguments regarding insolvency. Further, during the oral closing arguments, the Court requested the parties to specifically state the elements of a preference under § 547(b) they believed were contested. In response, the Defendants stated that the Trustee had not established that the transfers were made on account of an antecedent debt. The Defendants did not raise any issue regarding insolvency. During trial, the Trustee relied on the presumption of insolvency provided in § 547(f) and on the testimony of his expert, Roger Stone, who reviewed the Debtor's financial records and testified as to his conclusion that the Debtor was insolvent at the time of the transfers to the Defendants. Other than some questioning of Stone based on speculation of what might have occurred, the Defendants presented no evidence to rebut the presumption of insolvency. Accordingly, as the presumption of insolvency was not contested or rebutted by the Defendants, this Court finds that the Debtor was insolvent at the time of the transfers.

the allegedly preferential transfer. *In re Bridge Information Systems, Inc.*, 474 F.3d 1063, 1066 (8th Cir. 2007). In addition, a debt is deemed to have been incurred on the date upon which the debtor first becomes legally bound to pay. *Id.* In the context of a contract, courts have found that a debt arises after the creditor has tendered performance pursuant to the terms of the contract. *In re Gold Coast Seed* Co., 751 F.2d 1118, 1119 (9th Cir. 1985) (citing *Matter of Emerald Oil Co.*, 695 F.2d 833, 837 (5th Cir. 1983)). The Seventh Circuit Court of Appeals has acknowledged that an antecedent debt exists when a creditor has a claim against a debtor, even if the claim is unliquidated, unfixed, or contingent. *Warsco v. Preferred Technical Group*, 258 F.3d 557, 569 (7th Cir. 2001) (citing *In re Energy Co-op., Inc.*, 832 F.2d 997, 1001 (7th Cir. 1987)).

The question of whether the transfers at issue were made on behalf of an antecedent debt is an example of the point this Court made earlier in this Opinion regarding the way a relatively standard preference issue is complicated by the parties' fundamentally different views of the contract terms and provisions. As will be explained in more detail below, in presenting their arguments as to whether or not an antecedent debt existed, the Trustee and the Defendants approach the question from widely divergent assumptions as to what constitutes used seed beans versus what constitutes unused seed beans.

In support of his position that an antecedent debt existed, the Trustee characterizes the contracts at issue as straightforward purchase contracts under which the Debtor purchased seed beans from the Defendants for resale to other farmers. Therefore, under the plain terms of such purchase contracts and applicable Illinois law, the title to the seed beans passed when the seed beans were delivered to the Debtor by the Defendants. According to the Trustee, once the Defendants priced and delivered their seed beans, they had fully performed their obligations under the contracts and there was nothing left for them to do. Therefore, the Debtor became obligated to pay the Defendants at that time because the Defendants' performance under the contracts was complete.

Under the Trustee's view, all of the seed beans delivered to the Debtor by the Defendants were purchased by the Debtor for the price set by the Defendants, and it is therefore immaterial if the seed beans were used and sold as seed or unused and sold as grain. According to the Trustee, whether the seed beans were used or unused only affected the amount of premium to be paid to the Defendants.

The Defendants argue that there was no antecedent debt because the contracts at issue (both non-speculative and speculative) were option only contracts, meaning that the Debtor only held "a mere option" to purchase the Defendants' seed beans. Under the Defendants' view of the contracts, the Debtor had to engage in some act or conduct to affirmatively exercise its option. According to the Defendants, to exercise its option, the Debtor must "use" the seed beans, which, in the Defendants' view means that the Debtor had to bag and resell the seed beans to farmers for planting.[6] If the Debtor used the seed beans, the option was exercised and the grower would be paid the set price plus all applicable premiums. If, however, the seed beans met the contract specifications but the Debtor did not use the seed beans, the Defendants considered that the option was not exercised and the Debtor was merely obligated to pay the difference between the agreed upon price and the price of the seed beans established by the Chicago Board of Trade on the date the seed beans were delivered to a grain elevator. In other words, according to the Defendants, the contracts merely set a floor or a guaranteed amount that the Defendants would receive for their seed beans. Therefore, the Defendants maintain that the calculation of the unused bushels is crucial because "the Debtor owes only a small part of the total value of the beans as market beans when they are unused," and the remaining portion of the proceeds, whether the seed beans were sold by the Debtor or the

---

[6]As support for this interpretation of the contracts, the Defendants cite the trial testimony of Kent Guymon. Guymon testified that, under his understanding of the contracts, the seed beans were owned by him until they were sold and put in the ground by the purchaser. He testified that his understanding was based on the fact that, "[w]hen the seed beans are delivered to customers' farms, they could still be spot checked for quality, germination, so forth, and up until the day that they're actually put in the ground they could be pulled because of quality issues. And at that point they become unused bushels."

Defendants, represent the value of the seed beans that the Defendants still own.  The Defendants

further maintain  that there is no evidence in the record regarding how the unused seed beans were

disposed of, and without such evidence, the Trustee cannot establish the existence of an antecedent

debt.

The Defendants further assert that their view of the arrangements under the contracts is

supported by the evidence presented at trial showing the seed beans were delivered by the

Defendants to the Debtor for storage, with a warehouse receipt being issued and the seed beans being

placed in segregated and designated bins.  Therefore, the Defendants still controlled the seed, and

because of this, there was no transfer or sale until such time as the Debtor exercised its option by

using the seed beans and, therefore, there was no antecedent debt.

Because the contracts are central to an understanding of the Debtor's relationship with the

Defendants, a detailed review of the contract provisions is necessary.  All of the contracts (both non-

speculative and speculative) provide, "[Defendant's name] (Producer) agrees to produce soybeans

for seed under the following terms and conditions for [Debtor] for the 2002 growing season."  The

contracts then specify the contract number, the variety of soybeans to be grown, and the number of

bushels.  The contracts then state that "[Debtor] has the option to buy said production on the

following basis" and go on to list several terms and conditions, which are broken into four sections.

Section I, Paragraph 1 sets forth the provision for pricing as follows:

> Price to be determined by the May 2003 Chicago Board of Trade (CBT) futures
> minus a $0.10 basis.  Producer must call the [Debtor's] office during normal daytime
> CBT trading hours when he wishes to price his production.  If producer does not
> establish price by May 1, 2003, then price may be established at any time thereafter
> based on the nearby month on the CBT by contacting the [Debtor's] office.

Section I, Paragraph 2 provides for a 50¢ premium to be paid for each usable unit and various other

premiums for moisture level, cull, and visual score for production delivered by the producer to the

Debtor.  Section I, Paragraph 2 further provides that if the Debtor, in its sole discretion, chooses to

pick up the production at the farm storage location, then the Debtor will pay a 35¢ premium for each usable unit in place of the premium for delivery by the producer.  Section I, Paragraph 3 of the non-speculative contract provides that the producer can establish the price any time after planting, and is responsible for making delivery on all quantities priced.  As noted earlier, under the speculative contract, the producer must wait until after deliver to establish price.  Section I, Paragraph 4 provides that "Payment to Producer will be written within seven days after the first Monday in May, 2003.  Pricing established after this date will be paid within ten business days after establishing price."

Section II specifies certain "Producer Responsibilities," including the delivery of a sample to the Debtor within fifteen days of harvest.  Section III sets out standard characteristics and quality requirements that the seed must meet, and that a determination of acceptability will be made by testing the sample submitted, but final approval will be based on the actual seed delivered.

Section IV, Paragraph 1 of the regular contract provides:

> If seed meets all requirements, but is not needed by [the Debtor], the company will pay Producer $0.25 per bushel.  If such seed has been priced at [the Debtor], then [the Debtor] will pay the difference of the CBT at the time of pricing and the CBT as of the day of delivery to the local elevator.  If the price is greater than established, then the amount will be deducted from the Producer settlement.

Section IV, Paragraph 1 of the speculative contracts is similar but does not contain the unused bushel premium, and provides as follows:

> If seed meets all requirements but is not needed by [the Debtor], there is no premium due Producer from the company except as may be allowable under Section 1 for delivered bushels.  If such seed has been priced at [the Debtor], then [the Debtor] will pay the difference of the CBT at the time of pricing and the CBT as of the day of delivery to the local elevator.  If the price is greater than established, then the amount will be deducted from the Producer settlement. (Emphasis added).

The evidence presented at trial shows each of the Defendants priced their seed beans at various times, and that the Debtor responded to each pricing call with a "Seed Grower Pricing Confirmation," which specifically states, "On [applicable date], Patriot Seed, Inc., accepted your

offer to sell . . ." and sets forth the details, such as the variety, the number of bushels, the CBT price, the date the Defendant priced the seed beans, the price set by the Defendant, and the contract number.[7]  The pricing confirmation also states, "Payment on the above pricing will be sent per the terms of your contract, subject to confirmation of delivery of all priced bushels."  Each Defendant also received a "Seed Grower Settlement Statement" form which shows, by contract number and variety, the number of contracted bushels, the number of optioned bushels, the number of bushels delivered, the number of bags produced, the number of unused bushels, the date priced, the date paid, the check number, the amount paid, and any other payment information such as the amount of any premiums earned by such Defendant.

After reviewing the contracts and the evidence presented at trial, this Court concludes that it need not affirmatively decide whether the contracts between the Debtor and the Defendants were purchase contracts as urged by the Trustee or option only contracts as urged by the Defendants.  Even if the contracts are viewed as option contracts, this Court disagrees with the Defendants' fundamental premise that the option to purchase the seed beans was exercised only if the Debtor bagged and sold the seed beans.  Although the contracts state that the Debtor "has the option to buy said production on the following basis," there is nothing in the contracts that indicates the Debtor's option was only exercised if the Debtor bagged and resold the seed beans.  Nor can it be concluded from the evidence that the parties intended this construction of the contracts.  Instead, the documentary evidence shows that the option to purchase the seed beans, which rested with the Debtor, was affirmatively exercised when the Debtor sent the Seed Grower Pricing Confirmation letter, which explicitly stated that the Debtor had accepted the offer to sell at the price set by each of the Defendants.[8]

---

[7] As shown in Appendix C, Kent Guymon priced all of the seed beans for himself as well as for Landen Guymon and Leslie Smith.

[8] Several of the Defendants testified at trial that, when they priced their seed beans, they merely requested a price, and such request did not equate to an offer to sell the seed beans on that day.  However, there is no evidence that the Defendants' ever challenged the statement on the Seed Grower Pricing Confirmation, and this Court does not find such self-serving testimony persuasive in view of the documentary evidence to the contrary.

Once the seed beans were priced and the Defendant's offer to sell was accepted, the Debtor's obligation to pay the Defendants under the contracts was triggered, even if the amount actually owed was not calculable at that time, and even if the seed beans were not bagged and re-sold to farmers for planting. As noted earlier, an antecedent debt exists when a creditor has a claim against the Debtor, even if the claim is unliquidated, unfixed or contingent. *See Warsco*, 258 F.3d at 569. Moreover, even under the Defendants' own argument, even if the seed beans were not bagged and re-sold to farmers for planting, the Debtor had an obligation to pay the "guaranty amount," which was the difference between the grower's price and the price on the Chicago Board of Trade on the day the seed beans were delivered to a grain elevator. The fact that this amount was unliquidated and could not be determined until the date the seed beans were delivered to a local elevator and priced in accordance with Section IV, Paragraph 1 of the contracts does not change the fact that the Defendants had a claim against the Debtor to recover this guaranteed amount if the seed beans were worth less on the day they were sold on the grain market than the price fixed by the Defendants.[9] Additionally, for seed beans delivered under the non-speculative contracts, the Debtor was also obligated to pay a premium of 25¢ per bushel for any seed beans that "met all requirements but [were] not needed" by the Debtor in addition to the guaranteed amount.[10]    Finally, for any seed beans that the Debtor used – that is, bagged and sold as seed beans – the Debtor also owed an antecedent debt for the price set by the grower plus any applicable premiums.[11]

The Defendants also rely heavily on testimony at trial that established that when the seed beans were delivered to the Debtor, the seed beans were placed in segregated bins and the

---

[9]Several of the Defendants testified during the trial that the Debtor had miscalculated their unused bushels on their Seed Grower Settlement Statements. However, there is no evidence that any of the Defendants challenged the Debtor's calculations prior to these adversary proceedings. Moreover, as discussed above, while a debt may be unliquidated on the date the Debtor first becomes obligated to pay, this does not affect the antecedent nature of such debt.

[10]During closing arguments, the Defendants conceded that the obligation to pay the unused bushel premiums were preferential.

[11]As pointed out by the Trustee, the Debtor accepted all the seed beans that were delivered by the Defendants; none were rejected due to quality issues.

Defendants were issued a document entitled "Warehouse Receipt." Thus, according to the Defendants, they maintained possession and control of the seed beans, and they were free to pick up their seed beans at any time. According to the Defendants, the fact that they still owned their seed beans is illustrated by the trial testimony of Kent Guymon, noted earlier in this Opinion, and by the testimony of Rich Gastler wherein he describes a meeting held at the Plum Tree Hotel in May of 2003 called by Woodrow Cheeseman, the principal shareholder and President of the Debtor, to discuss the late payments. According to Gastler, the growers attending that meeting were told by Cheeseman that they could pick up their seed beans if they wanted them. Gastler testified that he did not pick up his seed beans because he took Cheeseman at his word regarding payment.

The documentary evidence, however, does not support the Defendants' theory. The contract language clearly contemplates a sale of the seed beans to the Debtor, as does the language of the Seed Grower Pricing Confirmation, rather than the storage or consignment type arrangement asserted by the Defendants. There is no language relating to storage or consignment in the contracts. Although the documents are entitled "Patriot Warehouse Receipt," nothing in the body of the documents indicates a traditional warehousing arrangement is contemplated. The documents show the name of the grower, the type of grain, the variety, the number of bushels delivered, and lists the bin number where the seed beans were to be stored. Some of the receipts also indicate how many samples were delivered and the moisture content of such samples. There is nothing on the receipt indicating the arrangement is for storage only or showing when the seed beans were to be returned to the Defendants. None of the documents show any fee for storage, which certainly would have been charged if storage was contemplated. There is nothing in the documents that shows the Defendants retained title in the seed beans.

The Defendants emphasize that the title of the document includes the words "warehouse receipt." However, the title of a document does not, in and of itself, control for purposes of

determining the document's legal effect; rather, the entire document must be considered.  The UCC, as adopted in Illinois, defines a warehouse receipt as " a receipt issued by a person engaged in the business of storing goods for hire."  810 ILCS 5/1-201(42).   As pointed out by the Trustee, the Debtor was a seed house and was not engaged in the business of storing goods for hire, and, therefore could not issue a "warehouse receipt" as that term is statutorily defined.

Finally, the Defendants' also note that two of the Defendants, Rich Gastler and Kent Guymon, testified at trial that the growers were required to maintain control and possession of their seed beans under the federal program for loan deficiency payments ("LDP") and other governmental loan programs.  The provisions for the federal LDP program and other governmental loan programs were not provided to the Court and the significance of the Defendants' participation in these programs and their alleged impact on the transactions with the Debtor were not fully developed or explained during trial.  Even without knowing the provisions of the programs, this Court may safely assume that at some point, the Defendants were free to sell the seed beans.  There is no evidence that the Defendants' transactions with the Debtor were in any way inconsistent with the LDP program or other governmental programs.  Even if there may have been some inconsistencies between the LDP program or other governmental programs and the Defendants' contracts with the Debtor, the Defendants were responsible for any such inconsistencies, as it was their responsibility to avoid such inconsistencies.  The Debtor was not a party to the federal LDP program or the other governmental programs and therefore could not be expected to be responsible for the Defendants' compliance with such programs.

Based on the foregoing, this Court concludes that the payments made by the Debtor to the Defendants were made on behalf of an antecedent debt.  The contracts were entered into by the parties in the spring of 2002 for the 2002 crop year.  (See Appendix A).  The seed beans were grown during the spring and summer of the 2002 crop year.  Most of the seed beans were harvested and

14

delivered to the Debtor in October and November of 2002 with a few delivered in mid-April of 2003. (See Appendix B). The Defendants priced their seed beans at various times between October 31, 2002 and May 2, 2003. (See Appendix C). The Debtor paid each of the Defendants between June 9, 2003 and June 26, 2003. The evidence shows that each of the Defendants priced the seed beans at different times, followed by an acceptance by the Debtor of the offer to sell.[12] Once the seed beans were grown, delivered, and priced, the Defendants' performance under the contract was complete and nothing remained for them to do. Although the dates for completion of performance differed for each Defendant, as set forth in the attached Appendices, the evidence shows that all the Defendants had completed their performance under the contracts well before the Debtor made the payments on or after the first week in June 2003. Once the Defendants' performance under the contracts was complete, the Debtor became legally obligated to pay the Defendants and the debt arose. *See Gold Coast Seed*, 751 F.2d at 1119. All that remained for the Debtor to do was to calculate the amounts due and make payment. Therefore, because it is clear that the Debtor first became obligated to pay each Defendant before the payments were made, this Court finds that the payments at issue were made on or account of an antecedent debt.[13]

The Defendants also argue that the Trustee has failed to prove a transfer of property of the Debtor's estate. This argument is based on the Defendants' position that to exercise its option under the contracts, the Debtor had to actually bag and sell the seed beans. According to the Defendants,

---

[12]The Court notes that there is an anomaly in the documentation for Defendant Rodney Rothert. The Seed Pricing Grower Confirmation letter and the Seed Grower Settlement Statement shows that for Contract No. 02-314, the seed beans were priced on 10/17/03, but the offer to sell was accepted on March 24, 2003. This anomaly was not explained during the trial testimony. The Court additionally notes that, during the trial, to avoid repetitive testimony, the parties stipulated that the documentary evidence contained in the exhibits introduced into evidence was accurate. In their brief, the Defendants assert that, because Rothert did not price his seed beans until October 14, 2003, payment was not due under the terms of the contracts until ten business days later and, as a result, the checks written by the Debtor in June of 2003 could not have been late payments. Under the Defendants' argument, Rothert did not price his seed beans until after he was paid for them. As this is an impossible scenario, this Court rejects the Defendants' argument and, for purposes of this Opinion, will assume the anomaly is the result of a typographical error in the Debtor's records.

[13]The Court notes that, because the payment was made later than provided for by the contract, the time between when the debt arose and when payment was made is even longer.

15

the payments made by the Debtor in June 2003 were merely a return of the cash proceeds of the Defendants' own seed beans, and therefore no property belonging to the Debtor was transferred. This is essentially the same argument the Defendants made in asserting that there was no antecedent debt. This Court has already concluded that the Debtor affirmatively exercised its option to purchase the seed beans when it sent the Seed Grower Pricing Confirmation letter stating that the Defendants' offer to sell had been accepted. Therefore, for the reasons set forth above in finding the existence of an antecedent debt, this Court concludes that the money transferred was property of the Debtor's estate.

Turning to the Defendants' affirmative defenses, the Defendants first assert that the events and occurrences of May and June 2003 between the Debtor and the Defendants would constitute a contemporaneous exchange for new value under § 547(c)(1). Again, this argument is based on the Defendants' position that the Debtor merely held an option on the seed beans, that option was not exercised on the seed beans that were not bagged and resold by the Debtor, and the Defendants had the option to pick up their unused seed beans. Specifically, the Defendants assert that the Debtor had the Defendants' unused bushels in its possession, and the Debtor gave the Defendants the option of taking their seed beans back in May or accepting payment in early June.[14] Thus, under the argument set forth by the Defendants, it was not until the Defendants actually received payment that they relinquished possession and control of the seed beans, and at that point, a contemporaneous exchange for new value occurred.

Section 547(c)(1) provides:

(c)    The trustee may not avoid under this section a transfer—
    (1)    to the extent such transfer was—
        (A)    intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
        (B)    in fact a substantially contemporaneous exchange.

---

[14]This argument comprises exactly one paragraph consisting of four sentences in the Defendants' brief.

11 U.S.C. § 547(c)(1).  Under this affirmative defense, a transferee has the burden of establishing by a preponderance of the evidence that (1) the transferee extended new value to the debtor in exchange for the transfer, (2) the debtor and the transferee intended the new value and debt payments to be contemporaneous, and (3) the exchange was in fact contemporaneous.  *In re Jones Truck Lines, Inc.*, 130 F.3d 323, 326-27 (8th Cir. 1997).

Section 547(c)(1)(A) requires both the Debtor and the Defendants to have intended a contemporaneous exchange for new value.  There is no evidence in the record showing the Debtor specifically intended for there to be contemporaneous exchanges.  Nor does the evidence permit this Court to conclude from the circumstances surrounding the transactions that contemporaneous exchanges were intended.

In asserting that the payments made in June by the Debtor were a contemporaneous exchange for new value, the Defendants again rely heavily on their argument that, if the seed beans were not bagged and sold by the Debtor, the Defendants could pick up their seed beans in lieu of receiving a late payment in June.   This argument, however, is at odds with the language in Section IV, Paragraph 1 of the contracts, which provides that if the seed beans meet all the quality requirements but are not needed by the Debtor, the Debtor will pay the difference of the price on the CBT at the time of pricing and the price on the CBT as of the day of delivery to the local grain elevator. Moreover, this Court, in considering whether an antecedent debt existed, has already determined that the Debtor exercised its option and that the Defendants had fully performed under the contracts well before the Debtor made the payments.  This finding necessarily precludes a determination that there was a substantially contemporaneous exchange for new value. Accordingly, this Court concludes that the evidence does not establish that there were in fact substantially contemporaneous exchanges under § 547(c)(1)(B).

17

The other affirmative defense raised by the Defendants is the ordinary course of business defense found in § 547(c)(2).  At the time of the transfers in question, § 547(c)(2) provided as follows:

The trustee may not avoid under this section a transfer–

* * *

(2) to the extent that such transfer was–

(A)  in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C)  made according to ordinary business terms.

11 U.S.C. § 547(c).[15]  Stated more simply, to succeed on the ordinary course of business defense, a creditor must prove:

(1) that the debt was incurred by the debtor in the ordinary course of business;

(2) that payment was made by the debtor in the ordinary course of business; and

(3) the payment was made according to ordinary business terms.

A creditor asserting the ordinary course of business defense has the burden to prove each element by a preponderance of the evidence.  11 U.S.C. § 547(g); *Matter of Midway Airlines*, *Inc.,* 69 F.3d 792, 797 (7th Cir. 1995).  If a creditor fails to prove any of the three elements, the defense is inapplicable.  *In re H.L. Hansen Lumber Co. of Galesburg, Inc.*, 270 B.R. 273, 277 (Bankr. C.D.Ill. 2001).

The purpose of the ordinary course of business defense is to "leave undisturbed normal commercial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of both the debtor and the debtor's transferee."  *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003).  Further, the ordinary course of business defense

---

[15]This section was modified as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and the amendments to this section became effective to cases filed on or after October 17, 2005.  Prior to the 2005 amendments, to establish the ordinary course of business defense, a creditor had to show *both* that the payment  was made in the ordinary course of the business of the parties and was made according to ordinary business terms.  After the 2005 amendments, a creditor need only show *either* that the payment was ordinary as between the parties *or* that it was made according to ordinary business terms.  Because the Debtor filed bankruptcy on September 4, 2003, before the effective date of the amendments, the Court will apply the prior statute and the case law interpreting it, unless otherwise noted.

furthers the policy of preventing dismemberment of the debtor during his slide into bankruptcy by enabling the debtor to make unavoidable payments that enables the struggling debtor to continue operating its business. *Union Bank v. Wolas*, 502 U.S. 151, 161, 112 S.Ct. 527, 532-33, 116 L.Ed.2d 514 (1991).

The first element of the ordinary course of business defense is that the debt was incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee. *See* § 547(c)(2)(A). During the trial, the Trustee admitted that the first element was present, although during the closing arguments, there was some confusion as to whether the Trustee was admitting this element. However, there is nothing in the record indicating that the debt was not incurred in the ordinary course of business of both the Debtor and the Defendants, and such an argument was not contained in Trustee's briefs. Therefore, the Court concludes that the debt was incurred in the ordinary course of business of the Debtor and the Defendants.

The second element requires that the payments were made "in the ordinary course of business or financial affairs of the debtor and the transferee." *See* § 547(c)(2)(C). Courts have interpreted this requirement to be "subjective" in nature insofar as it requires courts to consider whether the transfer was ordinary in relation to the other business dealings between the debtor and that particular creditor. *In re Globe Manufacturing Corp.*, 567 F.3d 1291, 1298 (11th Cir. 2009).[16]

To determine whether the payments were made and received in the ordinary course of the parties' business dealings, the court must make a factual inquiry into the prior dealings of the parties. *In re Schick*, 234 B.R. 337, 348 (Bankr. S.D.N.Y. 1999). The goal of the inquiry under § 547(c)(2)(B) is to establish a "baseline" of dealings between the parties fixed at least in part during a time in which the debtor's day-to-day operations were "ordinary" in the layman's sense of the word. *In*

---

[16]As opposed to the third element of the ordinary course defense – that the payment is made according to ordinary business terms common in the industry – which is referred to as the "objective component."

*re Hancock-Nelson Mercantile Co., Inc.*, 122 B.R. 1006, 1013 (Bankr.D.Minn. 1991); *see also*

*Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993) ("The most important

thing is . . .that [the dealings between the debtor and the allegedly favored creditor] conform to the

norm established by the debtor and the creditor in the period before, preferably well before, the

preference period"). The Seventh Circuit Court of Appeals has provided the following non-

exhaustive list of factors to consider in evaluating whether a transaction satisfies this second

element:

> (1) the length of time the parties were engaged in the transaction at issue;
>
> (2) whether the amount or form of tender differed from past practices;
>
> (3) whether the debtor or the creditor engaged in any unusual collection or payment activity; and
>
> (4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Kleven,* 334 F.3d at 642 (citing *Barber v. Golden Seed, Co. Inc.*, 129 F.3d 382, 390 (7th Cir. 1997)).

Additionally, some courts also consider the timing of the payments as a factor to evaluate. *See*

*Hansen Lumber*, 270 B.R. at 277. Untimely payments are more likely to be considered outside the

ordinary course of business and therefore avoidable as preferences. *Globe Manufacturing Corp.*, 567

F.3d at 1298 (quoting *In re Craig Oil Co.*, 785 F.2d 1563, 1567-68 (11th Cir. 1986)). However, a

creditor may present evidence to rebut the presumption that late payments were out of the ordinary.

*Id*. Thus, although as a general rule the relationship between the parties may be determined by

looking at their specific contractual agreement, it is possible for the parties to deviate from or modify

their written contract and still act within the ordinary course of their business dealings as long as the

parties had previously acted outside of their contract. *See Matter of Xonics Imaging Inc.*, 837 F.2d

76, 766-67 (7th Cir. 1988); *Tolona Pizza*, 3 F.3d at 1032 ("[A] 'late' payment really isn't late if the

parties have established a practice that deviates from the strict terms of their written contract.")

The Trustee asserts that a review of the totality of the circumstances shows that the payments made to the Defendants in 2003 fell outside the ordinary course of business between the parties. According to the Trustee, 2003 was not an ordinary year because the payments to all of the growers that the Debtor paid were paid late, the Debtor wrote a letter to the growers stating that the payments would be made late, the Debtor held a meeting for the growers to explain the late payments, and, most significantly, the Debtor offered and paid the growers 1% interest on the late payments, allowing them to receive 101% of their claims.

The Defendants make several arguments in response. First, they counter that, based on their expert witness's report and testimony, the ordinariness of the payments should be measured from the date the Debtor received the factor money from Farm Plan, not the contractual due date, and that when viewed from this perspective, the 2003 payments were made within the same window of time as in years past and thus were ordinary as between the parties. The Defendants also emphasize that the late payment was not caused by activity of either the Debtor or the Defendants, and the Defendants did not engage in any unusual collection activity, such as threatening to sue or to take back their seed beans, to compel the payments by the Debtor. Finally, the Defendants characterize the May 16, 2003 letter as a restructuring or workout agreement necessitated by the fact that the Debtor decided to sell its receivables to Farm Plan, which resulted in a thirty-day delay in receiving the funds from Farm Plan. The Defendants, citing cases holding that a first-time transaction can be considered ordinary between the parties, argue that a restructuring agreement can be in the ordinary course of business even if there is no precedent between the parties for such a restructuring agreement.

Both the regular and the speculative contracts provided that if the grower priced his seed beans by May 1, 2003 (for crops that were planted in 2002), payment would be made within seven days after the first Monday in May. For growers who priced their seed beans after May 1, payment

21

was to be made within ten business days after pricing. For the year in question, the payment date established by the contracts was May 12, 2003.

The Trustee's expert, Roger Stone, submitted an expert report in which, among other things, he analyzed the Debtor's files with its seed bean growers to determine if the Debtor followed their normal business payment practices for the 2002 crop year. In his report, Stone explained that he broke the seed bean grower files he reviewed into two categories: (1) seed bean grower files for 2000 through 2002, which did not include the files of any grower with whom there were pending collection efforts by the Trustee at the time of the review, and (2) seed bean grower files for 1996 through 2002 for those growers with whom there were pending collection efforts.[17] Stone stated that he placed the checks paid by the Debtor into the following three categories: checks for seed beans priced before May 1, checks for seed beans priced after May 1, but before May 10, and checks for seed beans priced after May 10.[18] After performing his review, Stone concluded that there was a significant change in the Debtor's business practices for crop year 2002 from prior years.

Stone first reviewed the seed bean grower files from 2000 through 2002 for growers not involved in collection efforts. From this review, Stone found that overall, 87% of these growers were paid according to the contract for crop year 2000, 84% were paid pursuant to the contract for crop year 2001, and 5% were paid according to contract for crop year 2002 (the year currently at issue). Further breaking the data into payments made to growers who priced their seed beans on or before May 1, Stone concluded that the records showed that 94% were paid according to the contract for crop year 2000, 93% were paid according to the contract for corp year 2001, and 1% were paid according to the contract for crop year 2002.

---

[17]Several of the growers with whom there were pending collection efforts settled their cases prior to trial.

[18]It appears Stone used May 10 as an arbitrary date representing the first Monday in May referred to in the contracts as the date by which the Defendants must price their seed beans to receive payment within seven days after the first Monday in May.

For growers who priced their seed beans after the first Monday in May, but before May 10, Stone concluded that the records showed that 94% were paid according to the contract for crop 2000, 90% were paid according to the contract for crop year 2001, and 0% were paid according to the contract for crop year 2002. For growers who priced their seed beans after May 10, Stone concluded that the records showed that 70% were paid according to the contract for crop year 2000, 65% were paid according to the contract for crop year 2001, and 0% were paid according to the contract for crop year 2002. Based on these percentages, Stone concluded that for all seed beans priced on or before May 1 for crop years 2000 and 2001, the Debtor's practice was to pay according to the due date established by the contract. For seed beans priced after the first Monday in May, Stone found more instances of payments not made within the terms of the contract, but stated that for crop years 2000 and 2001, the Debtor paid at least 58% of the growers who priced after May 10 within the contract terms. However, for crop year 2002, the Debtor only paid four growers (or 33%) who priced their seed beans after May 10 within the contract terms.

For the growers with whom there were pending collection actions at the time of his review, including the Defendants in the instant cases, Stone performed a similar analysis of the seed bean grower files but over a longer period of time—from crop years 1996 to crop year 2002. From this review, Stone likewise concluded that there was a significant change in the Debtor's business practices for crop year 2002 as compared with previous years. For growers who priced their seed beans on or before May 10, Stone concluded the Debtor's practice was to pay pursuant to the terms of the contract, except for crop year 2002. For seed beans priced after May 10, Stone found more instances of payments not within the terms of the contract. However, Stone found that 79% of the growers who priced their seed beans after May 10 were paid within the terms of the contract from 1996 through 2001. In 2002, only 2 growers (or 22%) who priced their seed beans after May 10 were paid within the terms of the contract.

23

Stone also noted that the contracts did not contain any provision for interest to be paid on late payments and found no evidence that interest on late payments was ever paid by the Debtor before 2003. From this, Stone concluded that payment of interest to the growers was not a normal business practice of the Debtor.

The Defendant's expert witness, Gary Murphey, took a different approach to the issue of the parties' past payment practices. In his expert report, he concluded that it was not unusual for the Debtor to have made late payments for crop year 2002, noting that the Debtor had a history of paying amounts past the due dates with a significant portion of the late payments falling between 1 and 60 days late. Thus, because the payments made to the Defendants in June of 2003 were 28 days late, with the exception of one payment (made to Ivan Murphy) made 31 days late, Murphey concluded such payments occurred within the Debtor's normal course of business.

Murphey's conclusion is based upon his observation that the Debtor was highly dependent upon paying the growers at the same time it received money from its factor; in other words, the Debtor could not pay the growers until its factor paid the Debtor. Based on this fact, Murphey concluded that the most applicable analysis was to look at the time period from which the Debtor received the funds from Farm Plan (instead of the payment date provided by contract) and compare this to the time period in which the Debtor paid the growers to determine the normal course of business between the parties. Based on his analysis for the years 2000 through 2002, Murphey concluded that the Debtor paid substantially all the growers within days of being funded by its factor and, therefore, in his opinion the payments made to the Defendants in 2002 were made within the ordinary course of business of the Debtor and the Defendants.

Aside from the expert reports and testimony of Stone and Murphy, there is other evidence in the record indicating that the Debtor deviated from past payment practices in 2003. The Debtor's

24

principal, Woodrow Cheeseman, gave a deposition in which he testified that the letter to the growers was to let them know that the Debtor was going to be a month later than normal in payment because the Debtor had not yet received its factor money.  Cheeseman admitted there was never a time, before 2003, when the Debtor told the growers it could not pay on time and offered interest on late payments.

Additionally, in the letter sent to the growers explaining the payments were going to be late, the first paragraph of the letter acknowledges the contract terms and informs the growers that those terms cannot be met:

> Under the terms of your 2002 soybean grower contract with us, payment on the production you had priced prior to 1 May 2003 was due to be sent to you by 12 May 2003.  With great apology, I regret to inform you that Patriot Seed has been forced to delay the sending of this payment.

The letter goes on to explain that the reason for the delay is due to the change in factors to Farm Plan and the way Farm Plan does business.  Finally, the letter states that "your payment will include 1% interest as compensation for the delay in payment."

From the record it is clear to this Court that in May 2003, the business dealings between the Debtor and its universe of all contracted growers, which includes the Defendants in the present adversary proceedings, differed significantly from those in previous years.  The across the board late payments to the Defendants coupled with the 1% interest payment take the transactions outside the realm of the ordinary course of the parties previous business dealings, wherein late payment by the Debtor was the exception rather than the rule.  Murphey's conclusion that the Debtor had a history of paying some of its growers between 1 and 60 days late and therefore payments made 28 days late fell within the ordinary course of business ignores the fact that in 2003, 95% of all of the Defendants and the other growers, were paid late for their 2002 crop of seed beans.  In crop years 2000 and 2001, the majority of the growers were paid on time, with a smaller number paid late.  However, in 2002,

25

the opposite was true—almost all the growers were paid late.  Moreover, there is no precedent in the

Debtor's history with its growers, including the Defendants before the Court in the current actions,

for paying 1% interest on the late payments.

The Defendants emphasize the fact that there is no evidence suggesting any of them engaged

in any kind of collection activity, unusual or otherwise, to force the Debtor to pay them in June 2003

and thus, there is no evidence that the Defendants pressured the Debtor into favoring them above

other creditors.  The Defendants cite *In re NorthPoint Communications Group, Inc.,* 361 B.R. 149,

157 (Bankr.N.D.Cal. 2007), in which the bankruptcy court concluded that, in addition to the four

standard factors, a court should consider any other facts that shed light on whether or not the transfer

in question resulted from pressure by the transferee or from the debtor's desire to prefer the

transferee over other creditors and that furthermore, the court should examine the facts not only to

determine the extent to which the transfer outwardly conforms with past practices between the

parties, but also to determine whether the transfer was the product either of these proscribed

purposes.  The court went on to note that:

> [T]here may be instances in which the objective characteristics of the transfer are so
> different from the prior dealings of the parties that the transfer should not be
> considered to be within the ordinary course of business between the parties, despite
> evidence that the transfer was not the product of creditor pressure or the debtor's
> desire to prefer the transferee over other creditors.  Such instances, however, should
> be limited to those in which the departure represents an aberration in the course of
> dealing between the parties [citations omitted].

The Defendants are correct that there is no evidence that the transfers were the product of pressure

on the Debtor by the Defendants.  The undisputed testimony at trial indicates that none of the

Defendants threatened any adverse action against the Debtor.  However, the evidence also indicates

that other unsecured creditors, especially Monsanto, did not get paid while the Defendants were paid

100% plus another 1% interest payment.  Thus, there is some evidence showing the Debtor's desire to prefer the Defendants over other unsecured creditors.[19]

Finally, the Defendants argue that courts have held that first time transactions can be ordinary under § 547(c)(2)(B) if the transactions fall within the terms of the parties' agreement, citing *Kleven*, 334 F.3d at 642-43 (noting that a first-time transaction is not per se ineligible for protection from avoidance under § 547(c)(2), and that in such an instance, the court should look to the parties' agreement to determine their ordinary course of business).  However, as has been made clear above, the payments were not made within the terms of the parties' contracts and therefore, the exception noted in *Kleven* does not apply.

Within their first-time transaction argument, the Defendants also analogize the change in circumstances due to the late receipt of the factor money from Farm Plan to a restructuring or workout agreement, citing *In re Metromedia Fiber Network, Inc.*, 2005 WL 3789133  at *8 (Bankr. S.D.N.Y. 2005) for the proposition that "[a] transfer consisting of a payment of antecedent debt on a reduced and deferred basis pursuant to a restructuring agreement should not be deemed out of the ordinary course of business under subpart (B) even if the formal restructuring has no precedent in the particular debtor-creditor relationship."[20]  According to the Defendants, the workout agreement was required because Farm Plan delayed payment of the factor money to the Debtor, resulting in the Debtor being unable to pay the Defendants on time.

The Defendants are correct that the court in *Metromedia Fiber* concluded that the fact that payments were made on a defaulted debt pursuant to a first time restructuring agreement does not

---

[19]Within this argument, the Defendants also assert that the difference in the timing of the payment in 2003 was the result of actions other than of the Debtor.  This Court disagrees with this assertion because the undisputed evidence shows that the change in timing of the payments was directly linked to the Debtor's decision to change factors from the State Bank of Lincoln to Farm Plan.

[20] It should be noted that, while the Defendants have raised the restructuring agreement issue under § 547(c)(2)(B), most courts analyze the issue primarily under § 547(c)(2)(C).  *See, e.g., In re Kaypro*,  218 F.3d 1070, 1073 (9th Cir. 2000).

27

per se disqualify the payment from the ordinary course of business under § 547(c)(2)(B).  *Id.* at *5.

However, the court in *Metromedia Fiber* went on to determine that the better approach is to look at

general practices in the industry of the creditor to see if the business terms of the transaction comport

with outer limits of normal industry practices under § 547(c)(2)(C).  *Id*. at *6.

   In another case dealing with a restructuring agreement, *In re Kaypro*, 218 F.3d 1070, 1073

(9th Cir. 2000), the Trustee sued to recover preferential transfers made pursuant to the terms of a

debt restructuring agreement to a supplier of the debtor.  The bankruptcy court had ruled that the

ordinary course of business exception under § 547(c)(2) did not apply as a matter of law to debt

restructuring agreements and granted partial summary judgment on that basis.  On appeal, the Ninth

Circuit Bankruptcy Appellate Panel (BAP) disagreed and held that the issue of whether payments

under a restructuring agreement are made in the ordinary course of business is a question of fact that

depends on the parties' dealings and industry practice.  The BAP, however, affirmed the partial

summary judgment, finding that the evidence in the record failed to raise a question of fact.  On

further appeal, the Ninth Circuit Court of Appeals found that whether payments made pursuant to

a debt restructuring agreement were within the ordinary course of business was a question of fact that

depends on the nature of industry practice.  *Id.* at 1074.  The court analyzed the issue under § 547(c)

(2)(C), and looked to see if the parties had presented evidence showing whether terms in question

were ordinary for industry participants under financial distress.  The court found that the record in

the case contained such evidence, and that such evidence was sufficient to create a genuine issue of

material fact.  *Id.*

   Contrary to the Defendants' assertions, this Court concludes that, under the facts of these

cases, the letter to the growers does not represent a workout or a restructuring agreement.  The letter

was not the product of any negotiations between the parties, but rather was a unilateral offer made

by the Debtor to the growers to compensate for the late payments necessitated by the change in

financing/factoring that had occurred.  Instead of reducing the amount of the debt, the letter actually

increased it by adding the 1% late fee in addition to any amounts owed pursuant to the contract

terms.  Further, it is clear that the Debtor did not restructure all its debt under the letter.  Instead, it

only focused on the debt owed to its seed bean growers.  There is nothing in the letter to the growers

or in any other evidence introduced that indicates the Debtor restructured its debt with any other

creditors.

Moreover, even if the letter at issue could be construed as a restructuring or workout

agreement, viewing the issue under § 547(c)(2)(C), the Defendants did not present any evidence that

restructuring or workout agreements are ordinary in the seed growing industry, or that it was an

ordinary seed growing industry practice to pay 1% interest on the late payments under the

circumstances such as those presented here.  This omission is fatal to the Defendants' argument.

Because there are multiple Defendants involved in this action, each with an individual

business history with the Debtor, the Court will examine each Defendant's prior relationship with

the Debtor individually to determine the subjective ordinariness of the transactions at issue.  The

Debtor's payment history with each Defendant prior to the 2002 growing year is as follows:

**David Cheney:**  The record shows that Cheney contracted with the Debtor to grow seed

beans from 1996 to 2002.  In 1996, the contract language did not contain a provision for payment

for seed beans priced after the first Monday in May.  For crop year 1996, Cheney did not price his

seed beans until June 10, 1997, and was paid by the Debtor with a check dated June 18, 1997.

Because the contract is silent on the payment due date for seed beans priced after May 1, it cannot

be affirmatively determined that the payment made by the Debtor was late.  For crop years 1997 and

1998, Cheney was paid pursuant to the terms of the contract.  For crop year 1999, Cheney received

one check that was 29 days late, one check that was 11 days late, and two checks that were timely

under the contract terms.  For crop year 2000, according to the settlement statement, it appears Cheney was paid with two checks that were approximately 60 days late for some of his seed beans. The third check Cheney received for that crop year was timely under the terms of the contracts.  The Trustee points out that the pricing confirmation letters contain a notation "for July 2001 payment," which according to the Trustee would make the two checks timely.  However, there is no explanation of this notation in the record, and this Court will not speculate as to its meaning.[21]  For crop year 2001, Cheney was paid pursuant to the terms of the contract.

**Rich Gastler:**  Gastler contracted with the Debtor from 1996 to 2002.  For crop year 1996, Gastler priced his seed beans on June 30, 1997.  Gastler was paid by Debtor with a check dated July 16, 1997.  As noted above, the 1996 contracts are silent on the payment due date for seed beans priced after May 1; therefore, this Court cannot affirmatively determine that the payment made by the Debtor on July 16, 1997 was late.  In all other years, Gastler was paid according to the contract terms.

**Rodney Rothert:**  Rothert contracted to grow seed beans for the Debtor from 1997 to 2002. Rothert received no late payments prior to crop year 2002.

**Ivan Murphy:**  Murphy contracted with the Debtor from 1998 to 2002.  In 1998,  Murphy received five timely payments and one payment that was approximately fifteen days late.  For crop years 1999 and 2000, Murphy was paid according to the contract terms.  In 2001, Murphy received one timely payment and one payment that was approximately ten days late.

**Kent Guymon:**  Guymon contracted with the Debtor in 1998, 1999, 2001 and 2002. Guymon did not receive any late payments prior to 2002.

---

[21]Woodrow Cheeseman testified in his deposition, which was introduced into evidence, that generally, if a grower was paid late, it was usually done that way pursuant to the grower's request.

**Leslie Smith:**  Smith contracted with the Debtor to grow seed beans in 1998, 1999, 2001 and 2002.  Smith did not receive any late payments prior to 2002.

**Landen Guymon & Jack Bima:**  The payment issued for crop year 2002 was the only payment issued by the Debtor to Guymon and Bima.  This was a first time transaction for both of these Defendants.

As to all of the Defendants except Landen Guymon and Jack Bima, it is clear that the payments made in 2003 for the seed beans grown in 2002 were made outside the subjective baseline established by the prior dealings of the parties.  In almost every case, any late payments by the Debtor to the Defendants were the exception rather than the rule.

With respect to Landen Guymon and Jack Bima, it is clear that they were not paid according to the terms agreed upon in their contracts.  As noted above, the Seventh Circuit Court of Appeals held that a first-time transaction is not *per se* ineligible for protection from avoidance under § 547 (c)(2).  *Kleven*, 334 F.3d at 642.  Although the history of the parties is the "strongest factor supporting a determination that the business between a debtor and an alleged preference creditor is ordinary," it is not necessary in every case.  *Id.*  In *Kleven*, the court stated that there are instances where such ordinary course may be established by the parties' agreement until that agreement is somehow or other modified by actual performance.  *Id*. at 643.  However, because Landen Guymon and Bima were not paid according to the terms of their contracts, *Kleven* does not apply to their situation.

Even if this Court had concluded that the Defendants met their burden of proving the second element of the ordinary course of business defense under § 547(c)(2)(B) that payment was made within the ordinary course of business between the Debtor and the Defendants, this Court still concludes that the Defendants failed to meet their burden to show that the transaction was objectively ordinary under the third element contained in § 547(c)(2)(C).  Section 547(c)(2)(C)

requires that the Defendants show the payments were made "according to ordinary business terms."

In discussing § 547(c)(2)(C), COLLIER ON BANKRUPTCY provides a general overview of what this

subparagraph requires as follows:

*[I]–The Industry Standard*

Subparagraph (C) establishes a requirement that a creditor prove that the debtor made the challenged transfer in harmony with the range of terms prevailing in some relevant industry's norms. The provision allows the creditor considerable latitude in defining what the relevant industry is; even departures from the relevant industry norms that are not so flagrant as to be "unusual" remain within subparagraph (C)'s protection.

"Ordinary business terms" refers to the range of terms that encompass the practices in which firms similar in some general way to the creditor in question engage, and only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subparagraph (C). This does not imply that the creditor must prove the existence of some single uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set of markets or submarkets which one could plausibly argue comprise the relevant industry.

*[II]–Defining the Industry.*

In order to determine whether the defendant has satisfied its burden of showing that the payments were withing industry standards, the court must first define the relevant industry. This is only a portion of the solution, however, since the court must determine how broadly or how narrowly to define the creditor's industry.

\* \* \*

*[IV]–Proof That Transfer Was Consistent with Industry Standards.*

Once the court has defined the relevant industry, chosen the industry standard and decided how much weight to give that standard, the court must weigh the evidence to determine whether the defendant has met the standard.

5 COLLIER ON BANKRUPTCY ¶547.04[2][a] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed.

rev.). Thus, there are three components on which a creditor must present evidence to prove this

element: (1) define the relevant industry; (2) establish the practices of that industry; and (3) establish

that the relations between the debtor and the creditor fall within the normal practices of that industry.

*See In re NETtel Corp, Inc.*, 364 B.R. 433, 453 (Bankr.D.Dist.Col. 2006).  On all components, the creditor/transferee has the burden of proof.

In the present case, the Trustee asserts that the Defendants failed to establish that the payments by the Debtor were made according to ordinary business terms.  Specifically, the Trustee asserts that the Defendants failed to properly define the industry that should be used to establish industry practices, rejecting the evidence provided by the Defendants' expert witness, Gary Murphey, that the appropriate industry standard is "farm supplies wholesale."  Instead, the Trustee asserts that the proper industry standard is the "seed production industry."  The Trustee also asserts that the Defendants failed to show the payment practices of the seed production industry or to establish a seed production industry practice of payment outside contract terms.

The Defendants assert that the evidence presented affirmatively shows there is no seed production industry standard from which the finder of fact can determine the ordinary credit terms for a seed bean grower contract; therefore, the Court must either look to the industry standard in the Debtor's industry (which the Defendants define as "farm supplies wholesale"), as opposed to the Defendant's industry (which the Defendants define as the "seed bean grower industry"), or look to typical transactions conducted between a farmer for ordinary market beans (as opposed to seed beans) with a grain elevator or a grain dealer in Illinois.  In other words, because there is no standard in the seed production industry, the relevant industry for comparison must therefore be defined more broadly.  The Defendants rely on the expert report and testimony of Gary Murphey, their expert witness, to establish the standards for the farm supplies wholesale industry.  Alternatively, in looking at transactions between farmers and grain elevators or grain dealers, the Defendants assert that they agreed to a deferred payment sale, and that a delay in the receipt of payment is an option always available to a farmer in the seed context.

33

The Defendants rely on the written expert report and trial testimony of Gary Murphey to establish the objective ordinariness of the transactions between the Debtor and the Defendants. In his expert report, Murphey stated without elaboration that, from correspondence provided by the Trustee as well as the Debtor's tax return, he confirmed that the Debtor's industry was classified as "Farm Supplies Wholesale." Murphey then obtained the Risk Management Association's (RMA) *Annual Statement Studies* for the relevant time period, which, he explained at trial, aggregates financial data for businesses in certain industries to be used in comparisons on industries that are similarly situated to evaluate the strength of the balance sheet or profit/loss statements. According to Murphey, the owners of a particular business select their company's standard industry classification. Murphey testified that the RMA compiles the financial data for each industry, including information regarding the average length of time trade debt is outstanding, referred to as "Days Payable." The analysis of days payable is how long it takes a company to pay an invoice once it hits accounts payable. According to Murphey, within each industry, the companies are ranked from best to worst in terms of days payable and divided into four equal-sized groups called "quartiles," and then ranked into three groups: an upper median, a median, and a lower median.

Murphey testified that the category of farm supplies wholesale consisted of data for 878 entities with year ends falling between April 2003 and March 2004. Murphey explained that he used this time period because that is the period in which the payments on the checks for the 2002 grower year were cut. For farm supplies wholesalers, the best paid within 16 days, the average or midpoint paid with within 27 days, and the lower median was 48 days. Murphey testified that this means that of the 878 entities analyzed, approximately 25% of the companies had days payable in excess of 48 days. From these statistics, Murphey concluded that the payments made by the Debtor to the Defendants that were made 28 days late (with the exception of one payment that was made 31 days

late), the payments made by the Debtors to the Defendants were made according to ordinary business terms.

On cross examination, Murphey admitted that the industry classification of farm supplies wholesale was a very broad category, including Growmark, which sells fertilizer, fuel, and farm chemicals, and Farm King, which sells everything from hunting equipment to hiking boots. He did not know if there was a category that dealt with seed or grain producers only. When challenged on the broadness of the category, Murphey testified that the businesses included in the farm supplies wholesale category had, generally speaking, the same customer base of farmers who need supplies.

In rebuttal, the Trustee presented the testimony and report of his expert witness, Roger Stone, on the issue of industry practices. Stone testified that, in his opinion, the industry for comparison used by Murphey in his analysis was too broad. For his report, Stone interviewed people in the soybean industry, in soybean associations, in national seed bean associations, as well as growers of seed corn. In his report, Stone stated that, according to his research, he learned that there were no set "industry" payment arrangements between seed companies and their growers, and that the specific payment arrangements were negotiated between the seed companies and the growers. However, Stone further opined that the standard practice in the seed industry was to pay the growers according to whatever terms were negotiated and memorialized in the written contract, or upon other mutually agreed upon terms.

During trial, Stone testified that there were many different payment arrangements and terms within the contracts of various companies, but that the consistent practice was to determine the timeliness of payments by the terms of the contract between the grower and the seed bean company. Stone opined that competition would eliminate companies who did not pay according to the terms set forth in the contract or under other mutually agreed upon terms. Thus, according to Stone, the

industry standard for timeliness was for the seed companies to pay the growers according to the terms set forth in the contracts.

The first step for this Court is to define the relevant industry whose standard should be used for comparison.  The reported cases indicate that the creditor has considerable latitude in defining the relevant industry; however, this latitude is not without some inherent limits.  In *In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 369 (5th Cir. 2002), the Fifth Circuit Court of Appeals advocated the use of market definition principles from antitrust law to determine the relevant industry for comparison:

> Defining the industry whose standard should be used for comparison is not always a simple task.  *See Tolona Pizza*, 3 F.3d at 1033 (questioning whether the appropriate industry included "the [sellers] of sausages to makers of pizza?  The [sellers] of sausages to anyone?  The [sellers] of anything to makers of pizza?").  In our view, for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product. [Citation omitted.]  We think that the industry benchmark inquiry is best illustrated by application:   In the case, [Defendant] might provide evidence, to the extent that it is reasonably available, of credit practices between suppliers to who [the Debtor] might reasonably turn for its seafood supply and firms with whom [the Debtor] competes for consumers, from which a bankruptcy judge can determine whether there is some basis to find that the [Defendant/Debtor] arrangement is not a virtual stranger in the industry.

The court in *Gulf City Seafoods* noted that the Third Circuit, in *In re Molded Acoustical Products, Inc.*, 18 F.3d 217 (3rd Cir. 1994), had also suggested that guidance could be had from market definition principles under antitrust law.  Offering additional direction, the court in *Gulf City Seafoods* noted:

> We recognize that there will be situations in which the debtor has only one or two companies to which it can reasonably turn for supplies or credit.  In theses cases, we are concerned that a creditor might not be able to show that its payment practices are "according to ordinary business terms," because the pool is too small to make such a determination.  In these small market cases, the creditor may show similar credit arrangements in other local industries with similar characteristics.

More recently, in *In re SGSM Acquisition Co., LLC*, 439 F.3d 233, 239 (5th Cir. 2006), the court reaffirmed this standard:

> As to what constitutes the relevant industry, *Gulf City* held that the term ordinarily encompasses "suppliers to whom [the debtor] might reasonably turn for [similar supplies] and firms with whom [the debtor] competes for customers." [*Gulf City Seafood*, 296 F.3d] at 369.

In *In re marchFirst, Inc.*, 381 B.R. 689, 697 (Bankr.N.D.Ill. 2008), the court endorsed the criterion of a similar market, both geographic and product, and confirmed that the proper inquiry under § 547 (c)(2)(C) focuses on the actual practices of the transferee's competitors.

In this case, Murphey's written report does not set forth the nature of the businesses going into the category of "farm supplies wholesale," but merely assumes without elaboration or explanation, that this is the applicable industry to be used for comparison. On cross examination during trial, Murphey admitted that the category was a very broad one that included businesses that sold equipment, chemicals, fertilizer, and fuel as well as hunting equipment and hiking boots, and included merchants such as Farm King and Growmark. Murphey testified that he did not know if there was a category that dealt with just seed or grain producers. Murphey asserted that the size of the company was irrelevant when looking at the industry category and the businesses included in this category all had the same customer base, which is farmers needing supplies. Notwithstanding Murphey's opinion, in this Court's view, this evidence is much too broad to inform the Court on the range of standard practices in the more limited universe of the seed or grain production industry.

Based on the above cited cases, it is clear that the applicable industry standard is to be ascertained based on the credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product. *See Gulf City Seafoods*, 296 F.3d at 369. However, before an industry standard can be determined, the Defendant must first define the industry to be used for

comparison. In this Court's view, the Defendants should have provided evidence, to the extent reasonably available, of credit practices of businesses to whom the Debtor might reasonably turn for supplies and businesses with whom the Debtor competes for customers. *Id*. If the market is too small, the Defendants could have shown credit arrangements in other local industries with similar characteristics. *Id*. at 369 n.8. Because the Defendants did not do so, this Court finds that the Defendants have failed to submit sufficient evidence for this Court to determine and define the relevant industry to be used for comparison in this case. Without a defined industry, this Court cannot ascertain a standard to be followed.

The Defendants argue that because both their expert and the Trustee's expert agree that there is no industry database or standard for comparison from which the Court can determine the ordinary credit terms for a seed bean grower contract, the industry must be defined more broadly to include more companies. However, the Defendants' approach ignores the explicit guidance given by the Seventh Circuit Court of Appeals in *Tolona Pizza*:

> [T]he creditor must show that the payment he received was made in accordance with the ordinary business terms in the industry. But this does not mean that the creditor must establish the existence of some single, uniform set of business terms, as *Tolona* argues. *DeSimone, supra,* at 127. Not only is it difficult to identify the industry whose norm shall govern (is it, here, the sale of sausages to makers of pizza? The sale of sausages to anyone? The sale of anything to makers of pizza?), but there can be great variance in billing practices within an industry. Apparently there is in this industry, whatever exactly "this industry" is; for while it is plain that neither Rose nor its competitors enforce payment within seven days, it is unclear that there is a standard outer limit of forbearance. It seems that 21 days is a goal but that payment as late as 30 days is generally tolerated and that for good customers even longer delays are allowed. The average period between Rose's invoice and *Tolona's* payment during the preference period was only 22 days, which seems well within the industry norm, whatever exactly it is. The law should not push businessmen to agree upon a single set of billing practices. . . .

* * *

> We conclude that "ordinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor

38

in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.

*Tolona Pizza*, 3 F.3d at 1033. The Defendants, although they had the burden of proof, wholly failed to present any evidence of the range of terms that encompasses the practices in which firms similar in some way to the creditor or debtor in question (in this case, seed producers) engage.[22] Accordingly, there is no basis for this Court to conclude that the dealings between the parties in this case are akin to other seed producers – they very well may be so "so idiosyncratic" as to fall outside that broad range of practices in which firms similar to the creditor engage and thus be outside the scope of § 547(c)(2)(C).[23]

Alternatively, the Defendants argue that the Court should look to the grain elevator industry to determine standard industry terms. Defendants cite an article written by Professors Uchtmann and Endres of the Department of Agricultural and Consumer Economics, University of Illinois at Urbana-Champaign that describes the four main marketing arrangements between a farmer and a grain elevator. One of these arrangements is described as a "deferred payment sale" under which the farmer delivers grain to the elevator at the current price, but the contract does not call for payment until a future date (perhaps after the start of the farmer's new tax year). Uchtmann & Endres, *Illinois Grain Insurance Fund: Protecting Farmers if an Elevator Fails*, AGRICULTURAL

---

[22]The Court notes that the Trustee's evidence on industry standard does not meet the *Tolona Pizza* criteria, either. The Trustee's expert stated that industry standard was to pay according to the contract terms negotiated by the parties. However, while he stated that there were hundreds of different arrangements, he did not give any specific examples of these arrangements. However, the Trustee does not have the burden of proof on this issue.

[23]One of the Defendants, Kent Guymon, testified that he encountered late payments in one of his other areas of business, the alfalfa production business, and he stated that, although his usual billing terms were net 30 days, he has received payments as late as 90 to 120 days late. He also stated that his son was in the hay baling business, and while his payment terms were also net 30, it was not uncommon for some customers to pay up to a year late. When asked for clarification, Guymon stated that not all of his customers paid late, but that out of 15 to 20 customers, 6 or 7 continually paid late. Although the Court allowed this testimony over the objection of the Trustee, the Court is not inclined to give it much weight because (1) it does not relate to the practices with respect to the production of seed bean, (2) there is no evidence showing any similarity of business practices between alfalfa production, hay baling and the seed bean industry, and (3) it is only the experience of one individual, and does not inform the Court as to what is acceptable in the industries of alfalfa production or hay baling generally. The Court is aware that late payments occur in all industries. The pertinent question however, is what are the range of acceptable payment terms for the seed production industry or an industry shown to be sufficiently similar to the seed bean industry. That question is not answered by Guymon's testimony.

LAW AND TAXATION BRIEFS, Issue 08-05, July 30, 2008, at 1.  The Defendants argue that by allowing the Debtor to maintain possession of the seed beans in May of 2003, they in effect agreed to a deferred payment sale, which is a common payment arrangement in the elevator industry.  The Defendants note that Roger Stone, the Trustee's expert, in his report stated that a representative of one of the seed companies advised that a delay in the receipt of payment is an option that is always available to a farmer in the seed bean industry.

The Trustee concurs that the grain elevator industry is similar to the seed production industry but argues that, because the grain elevator industry is heavily regulated by state law, a grain elevator that cannot satisfy its payment agreements is subject to having its licence suspended and its assets seized and liquidated for the benefit of claimants.  Therefore, under a grain industry analysis, if the Debtor was unable to satisfy its agreements with the Defendants, it would be at risk of losing its license and assets, which would not be in the "ordinary course of business" under the applicable industry standard.

There are several problems with the Defendants' argument.  First, no evidence of standard practices in the grain elevator industry was introduced at trial.  The Defendants rely on an article from an agricultural journal attached to the Defendants' Trial Brief, which discusses the payment arrangements only in general terms.  There is no discussion of specific payment arrangements in the article, so it does not inform the Court of a range of terms that are acceptable within the industry, and thus fails the *Tolona Pizza* test.

Second, the Defendants argue that by acquiescing to the Debtor's proposal for late payment, they were effectively exercising their option to receive deferred payments, which is a standard industry practice in the grain elevator industry.  However, in the instant case, it was the Debtor who unilaterally deferred the payments.  Nothing in the record shows that the Defendants either requested or affirmatively agreed to such a deferral in payments.  Contrary to the Defendants' assertions, their

40

silence and inaction in the face of the Debtor's notification that payments would be made late cannot be construed as an affirmative exercise of their option to defer payments. Accordingly, this Court concludes the Defendants have not established that the payments were made according to ordinary business terms in the grain elevator industry.

Lastly, the Defendants make an argument that applies to the ordinary course of business defense as a whole by emphasizing the following statement contained in the Debtor's proposed Combined Chapter 11 Plan of Reorganization and Disclosure Statement, which was prepared by the Debtor in conjunction with Attorney Barry Barash ("Barash"), who was the Debtor's attorney at the time and now represents the Trustee in these preference actions:

> Based upon the foregoing [description of events leading to the late payments to the growers regarding the change in financing arrangements], debtor's counsel believes that it is more probable than not that the bankruptcy court would not find the payments to the bean producers avoidable preferences. They are not so far out of the ordinary course of dealing as to fall within the holding of <u>Tolona Pizza,</u> nor are they so untimely as to run afoul of the rule in <u>In re Hansen Lumber Company of Galesburg, Inc.</u>, 270 B.R. 273 (Bankr.CD Ill. 2001, Perkins, J.)

The Defendants assert that the Court has the discretion to consider the pleadings and documents filed by counsel to be judicial admissions and that the Court should consider the effect of this admission in determining the outcome of this case (both under § 547(c)(2)(B) & (C)).

During opening arguments, Barash stated that when he drafted the plan and disclosure statement, he was "wrong" that the court would probably not conclude the grower payments were avoidable preferences. During closing arguments, Barash added that at the time he drafted the disclosure statement in the Chapter 11 case, he did not know about the meeting the Debtor called with the growers at the Plum Tree Hotel. Barash stated that if he had known about this meeting, he would have taken a different position.

According to the decided cases, it is up to the discretion of the court whether to treat statements such as these as binding judicial admissions. *See American Title Ins. Co. v. Lacelaw*

41

*Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) (noting that the court may, in its discretion, treat statements made in briefs as binding judicial admissions. However, where the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight. *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859-60 (9th Cir.1995)).

In this Court's view, the statement does not constitute a judicial admission in these adversary proceedings. The statement was made while the bankruptcy case was a Chapter 11 as part of the Debtor's disclosure statement. A disclosure statement is merely a Chapter 11 Debtor's view of its situation and a proposal of how it intends to proceed. The disclosure statement is not binding on creditors, who are free to evaluate the representations and statements and object if necessary. In this context, the statement was made on behalf of the Debtor who was attempting to get creditor approval of a plan of reorganization. It was not made after the bankruptcy case was converted to a case under Chapter 7 or as part of these adversary proceedings on behalf of the Chapter 7 Trustee, who was not a party to the Chapter 11. In addition, the statement was made in the Chapter 11 disclosure statement where the issue involved was not the main focus. In this adversary proceeding, the issue has been framed and tried. The effect of construing it against the Chapter 7 Trustee would be to the detriment of the Debtor's unsecured creditors, not the Debtor.

Finally, the statement does not involve a fact, but is rather Barash's opinion as to the probability of what a bankruptcy court might or might not rule on the preference issue. Having heard the evidence and concluded recoverable preferences exist, Barash's opinion cannot take precedence over this Court's opinion.

In conclusion, for the reasons set forth above, this Court finds that each of the Defendants received preferences in the amounts set forth in the accompanying orders. However, there are two additional issues that must be addressed. First, in reviewing the complaints filed in each adversary proceeding, the Trustee, pursuant to § 502(d) of the Code, included a count requesting the

42

disallowance of unsecured claims filed by the Defendants.  Section 502(d) provides that a court

"shall disallow any claim of any entity from which property is recoverable under section . . . 550 .

. . or that is a transferee of a transfer avoidable under section . . . 547 . . . unless such entity or

transferee has paid the amount, or turned over any such property for, which such entity or transferee

is liable under section . . . 550 . . ."  Asserting that the Defendants have not paid the amounts for

which they are liable under § 550, the Trustee argues that any unsecured claim filed by the

Defendants must be disallowed.[24]

The Trustee's request for disallowance of the Defendants' claims is premature.  The Trustee

brought these avoidance actions under § 547, and this Court has now determined that they are

meritorious and that the Trustee is entitled to recovery of the preferential payments as requested in

each case.  If the Defendants return the preference payments, they are entitled, under the language

of § 502(d), to file unsecured claims and to take their *pro rata* shares along with the Debtor's other

unsecured creditors.   Only if one or more of the Defendants does not pay over the preference

amounts would the Trustee be entitled to disallowance of those Defendants' claims.  Accordingly,

this Court will deny any relief under this count at this time without prejudice to the Trustee's filing

of a motion requesting such relief at a later time, if necessary.

Second, the Trustee has requested prejudgment interest in each case, asserting such interest

is necessary to make the Trustee whole.  The Bankruptcy Code does not specifically provide for

prejudgment interest.  Nevertheless, the Seventh Circuit Court of Appeals has made it clear that in

an action under § 547(b), bankruptcy courts have discretion to award prejudgment interest to a

successful plaintiff.  *Matter of P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir. 1998); *Matter of*

*Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997).  Such discretion must be

---

[24]The only Defendant who has filed a claim in this case is Ivan Murphy.  On January 21, 2004, he filed Claim No. 202-1 for $23,422.86 as "unknown."

exercised according to law, which means that prejudgment interest should be awarded unless there

is a sound reason not to do so. *Milwaukee Cheese Wisconsin*, 112 F.3d at 849. The Seventh Circuit

Court of Appeals has also recommended that, where no statutory rate of prejudgment interest exists,

the best starting point is to award interest at the market rate, which means an average of the prime

rate for the years in question. *Cement Div., National Gypsum Co. v. City of Milwaukee*, 144 F.3d

1111, 1114 (7th Cir. 1998). The "prime rate" is reported by the Federal Reserve Board. *See Till v.*

*SCS Credit Corp.*, 541 U.S. 465, 479, 1245 S.Ct. 1951, 1961, 158 L.Ed.2d 787 (2004). A successful

plaintiff is entitled to prejudgment interest from the date of demand for return of the preferential

transfer or, if no demand was made, from commencement of the adversary proceeding. *In re*

*Schwinn Bicycle Co.*, 205 B.R. 557, 574 (Bankr. N.D.Ill. 1997).

In these cases, there is nothing in the record indicating any reason not to allow prejudgment

interest. However, the Trustee did not set forth a proposed interest rate. In a companion case,

*Barber v. Treimer Industries*, Adv. No. 04-8205, decided this same day, the Trustee requested

interest at the rate of 4.43%. Accordingly, in these adversary proceedings, the Court also awards

prejudgment interest from the date the complaint was filed to the date of judgment at the rate of

4.43%.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance

with Federal Rule of Bankruptcy Procedure 7052. See Orders entered this day.

# # #

44

# Appendix A (Information taken from the contracts between the Debtor and the Defendants)

| Name | Contract No. | Variety | Bushels Contracted |
|------|--------------|---------|--------------------|
| Ivan Murphy | 02-305 | 31X12 | 10,000 |
| | 02-308 | 33R03 | 12,600 |
| | 02-313 | 34X09 | 12,520 |
| | | | |
| Rodney Rothert | 02-309 | 33R03 | 4,640 |
| | 02-314 | 34X09 | 5,880 |
| | 02-322 | 37X11 | 6,600 |
| | 02-327 | 39R19 | 3,400 |
| | 02-331 | 39X18 | 5,200 |
| | | | |
| | | | |
| Rich Gastler | 02-306 | 32R11 | 3,800 |
| | 02-317 | 36X17 | 3,200 |
| | 02-329 | 39X18 | 4,800 |
| | 02-329-SPEC | 39X18 | 3,000 |
| | 02-333 | 41X11 | 5,600 |
| | 02-326 | 39R19 | 5,000 |
| | 02-339 | EXM40NRR | 3,200 |
| | 02-339-SPEC | EXM40NRR | 1,200 |

| Name | Contract No. | Variety | Bushels Contracted |
|---|---|---|---|
| Dave Cheney | 02-306 | 32R11 | 3,800 |
| | 02-326 | 39R19 | 5,000 |
| | 02-333 | 41X11 | 5,600 |
| | 02-339 | EXM40NRR | 3,200 |
| | 02-339-SPEC | EXM40NRR | 1,200 |
| | | | |
| Kent Guymon | 02-318 | 36X17 | 3,200 |
| | 02-318-SPEC | 36X17 | 1,600 |
| | 02-330 | 39X18 | 4,000 |
| | 02-330-SPEC | 39X18 | 2,080 |
| | | | |
| Landen Guymon | 02-330 | 39X18 | Info not available (contracts not in evidence)* |
| | | | |
| Leslie Smith | 02-330 | 39X18 | 4,000 |
| | 02-330-SPEC | 39X18 | 2,080 |
| | | | |
| Jack Bima | 02-279 | 29X11 | 1,600 |
| | | | |

*No contracts for Landen Guymon were introduced into evidence, but he apparently received a portion of the proceeds under Kent Guymon's Contract No. 02-330 according to the Seed Grower Settlement Statement.  It is unclear from the documentation whether those proceeds were also from Contract No. 02-330 SPEC as the Seed Grower Settlement Statement does not differentiate between the non-speculative and the speculative contracts.  This Court will not make assumptions, but will merely summarize the evidence as it exists.

# Appendix B (Information taken from Seed Grower Settlement Statements* & Warehouse Receipts)

| Name | Contract No. | Variety | Bushels Contracted | Bushels Delivered | Date(s) Delivered | Bushels Unused |
|------|------|------|------|------|------|------|
| Ivan Murphy | 02-305 | 31X12 | 10,000 | 11,455.67 | 10/10/02 & 10/11/02 | 11,455.67 |
| | 02-308 | 33R03 | 12,600 | 16,315.35 | 10/09/02 | 15,205.01 |
| | 02-313 | 34X09 | 12,520 | 16,655.33 | 10/02/02, 10/03/02 & 04/11/03 | 16,655.33 |
| | | | | | | |
| Rodney Rothert | 02-309 | 33R03 | 4,640 | 5,327.66 | 10/22/02 | 5,327.66 |
| | 02-314 | 34X09 | 5,880 | 5,676.67 | 10/19/02 | 0 |
| | 02-322 | 37X11 | 6,600 | 5,355.34 | 10/16/02 | 0 |
| | 02-327 | 39R19 | 3,400 | 3,346.00 | 10/23/02 | 3,346.00 |
| | 02-331 | 39X18 | 5,200 | 5,841.99 | 10/11/02 | 5,841.99 |
| | | | | | | |
| Rich Gastler | 02-306 | 32R11 | 3,800 | 3,805.33 | 10/08/02 | 3,805.33 |
| | 02-317 | 36X17 | 3,200 | 3,257.01 | 10/11/02 | 3,257.01 |
| | 02-329 | 39X18 | 4,800 | 8,188.97 | 10/11/02 & 01/15/03 | 3,523.99 |
| | 02-329-SPEC | 39X18 | 3,000 | " | " | " |
| | 02-333 | 41X11 | 5,600 | 6,442.34 | 10/22/02 | 0 |
| | 02-326 | 39R19 | 5,000 | 5,023.99 | 11/09/02 | 5,023.99 |
| | 02-339 | EXM40NRR | 3,200 | 4,970.99 | 11/08/02 | 0 |
| | 02-339-SPEC | EXM40NRR | 1,200 | " | " | " |

| Name | Contract No. | Variety | Bushels Contracted | Bushels Delivered | Date(s) Delivered | Bushels Unused |
|---|---|---|---|---|---|---|
| Dave Cheney** | 02-306 | 32R11 | 3,800 | 3,805.33 | 10/08/02 | 3,805.33 |
|  | 02-326 | 39R19 | 5,000 | 5,023.99 | 11/09/02 | 5,023.99 |
|  | 02-333 | 41X11 | 5,600 | 6,442.34 | 10/22/02 | 0 |
|  | 02-339 | EXM40NRR | 3,200 | 4,970.99 | 11/08/02 | 0 |
|  | 02-339-SPEC | EXM40NRR | 1,200 | " | " | " |
|  |  |  |  |  |  |  |
| Kent Guymon | 02-318 | 36X17 | 3,200 | 4,963.34 | 10/01/02 | 0 |
|  | 02-318-SPEC | 36X17 | 1,600 | " | " | " |
|  | 02-330 | 39X18 | 4,000 | 5,170.66 | 04/10/03 | 0 |
|  | 02-330-SPEC | 39X18 | 2,080 | " | " | " |
|  |  |  |  |  |  |  |
| Landen Guymon *** | 02-330 | 39X18 | Info not available (contract not in evidence) | 5,170.66 | 04/10/03 | 0 |
|  |  |  |  |  |  |  |
| Leslie Smith*** | 02-330 | 39X18 | 4,000 | 5,170.66 | 04/10/03 | 0 |
|  | 02-330-SPEC | 39X18 | 2,080 | " | " | 0 |
|  |  |  |  |  |  |  |
| Jack Bima | 02-279 | 29X11 | 1,600 | 2,476.66 | 03/24/03 | 0 |

*The Seed Grower Settlement Statement does not differentiate between the non-speculative and the speculative contracts; rather it shows the aggregate bushels contracted for under the contract number and variety.

**David Cheney is a share participant in Defendant Rich Gastler's contracts. However, the numbers shown for bushels contracted, bushels delivered and bushels unused reflect the aggregate totals under the contract and are not broken down by allocable share as that is the way the information is shown on the Seed Grower Settlement Statement for each variety of seed beans.

***Leslie Smith is a share participant in Kent Guymon's Contract No. 02-330 and 02-330-SPEC.  According to the Seed Grower Settlement Statement, Landen Guymon received a portion of the proceeds under Kent Guymon's Contract No. 02-330 (and possibly 02-330-SPEC), but no contracts were introduced into evidence for Landen Guymon, and Kent Guymon's contracts do not refer to Landen Guymon.  The numbers shown above for Leslie Smith and Landen Guymon for bushels contracted, bushels delivered, and bushels unused reflect the aggregate totals as shown on the Seed Grower Settlement Statement for each variety of seed beans rather than individual totals.

# Appendix C (Information taken from Seed Grower Pricing Confirmation letters)

| Name | Contract # | Variety | Date priced | # Bushels Priced | Price | Date Offer to Sell Accepted |
|------|-----------|---------|-------------|------------------|-------|------------------------------|
| Ivan Murphy | 02-305 | 31X12 | 10/31/91 | 2,000 | $5.460 | 11/05/02 |
| | " | " | 11/27/02 | 2,000 | $5.5400 | 12/02/02 |
| | " | " | 03/26/03 | 1,026 | $5.6500 | 04/01/03 |
| | " | " | 03/26/03 | 5,403.67 | $5.6500 | 04/01/03 |
| | " | " | 10/31/02 | 2,000 | $5.4600 | 04/28/03 |
| | " | " | 11/27/02 | 2,000 | $5.5400 | 04/28/03 |
| | " | " | 03/26/03 | 1,026 | $5.6500 | 04/28/03 |
| | " | " | 03/26/03 | 5,403.67 | $5.6500 | 04/28/03 |
| | | | | | | |
| | 02-313 | 34X09 | 01/02/03 | 2,467.50 | $5.5250 | 01/02/03 |
| | " | " | 03/11/03 | 6,841.33 | $5.6100 | 03/11/03 |
| | " | " | 04/15/03 | 4,879 | $5.9900 | 04/28/03 |
| | | | | | | |
| | 02-308 | 33R03 | 01/23/03 | 2,000 | $5.4950 | 01/23/03 |
| | " | " | 04/01/02 [sic] | 5,000 | $5.6650 | 04/01/03 |
| | " | " | 03/28/03 | 5,000 | $5.6850 | 04/01/03 |
| | " | " | 04/02/03 | 4,315.35 | $5.7200 | 04/02/03 |

| Name | Contract # | Variety | Date priced | # Bushels Priced | Price | Date Offer to Sell Accepted |
|---|---|---|---|---|---|---|
| Rodney Rothert | 02-322 | 37X11 | 03/14/03 | 5,000 | $5.6500 | 03/15/03 |
| | " | " | 03/17/03 | 355.34 | $5.6300 | 03/24/03 |
| | | | | | | |
| | 02-314 | 34X09 | 10/14/03 [sic] | 5,000 | $5.6500 | 03/15/03 |
| | " | " | 10/17/03 [sic] | 676.67 | $5.6300 | 03/24/03 |
| | | | | | | |
| | 02-309 | 33R03 | 03/17/03 | 327.66 | $5.6300 | 03/24/03 |
| | " | " | 02/25/03 | 5,000 | $5.6600 | 02/25/03 |
| | | | | | | |
| | 02-327 | 39R19 | 03/17/03 | 3,346 | $5.6300 | 03/24/03 |
| | | | | | | |
| | 03-331 | 39X18 | 03/17/03 | 5,841.99 | $5.6300 | 03/24/03 |

| Name | Contract # | Variety | Date priced | # Bushels Priced | Price | Date Offer to Sell Accepted |
|---|---|---|---|---|---|---|
| Rich Gastler | 02-339 | EX1740NRR | 03/05/03 | 1,000 | $5.5750 | 03/17/03 |
| | " | " | 03/31/03 | 1,485.99 | $5.6550 | 04/28/03 |
| | | | | | | |
| | 02-333 | 41X11 | 01/10/03 | 2,500 | $5.4300 | 01/10/03 |
| | " | " | 02/13/03 | 721.17 | $5.6100 | 02/21/03 |
| | | | | | | |
| | 02-326 | 39R19 | 01/03/03 | 2,500 | $5.6500 | 01/03/03 |
| | | | | | | |
| | 02-306 | 32R11 | 02/13/03 | 1,902.66 | $5.6100 | 02/21/03 |
| | | | | | | |
| | 02-317 | 36X17 | 02/13/03 | 1,628.50 | $5.6100 | 02/21/03 |
| | | | | | | |
| | 02-329 | 39X18 | 02/13/03 | 3,094.48 | $5.6100 | 02/21/03 |
| | " | " | 01/24/03 | 1,000 | $5.5500 | 01/25/03 |

| Name | Contract # | Variety | Date priced | # Bushels Priced | Price | Date Offer to Sell Accepted |
|---|---|---|---|---|---|---|
| Dave Cheney | 02-333 | 41X11 | 01/08/03 | 1,000 | $5.6700 | 01/08/03 |
| | " | " | 11/27/02 | 2,000 | $5.5500 | 12/03/02 |
| | " | " | 03/05/03 | 221 | $5.5750 | 03/17/03 |
| | | | | | | |
| | 02-339 | EX1740NRR | 01/27/03 | 1,000 | $5.6025 | 01/30/03 |
| | " | " | 03/05/03 | 485 | $5.5750 | 03/17/03 |
| | " | " | 02/27/03 | 1,000 | $5.7275 | 02/27/03 |
| | | | | | | |
| | 02-326 | 39R19 | 01/03/03 | 2,000 | $5.6500 | 01/03/03 |
| | " | " | 02/13/03 | 98 | $5.6000 | 02/13/03 |
| | " | " | 03/05/03 | 413 | $5.5750 | 03/17/03 |
| | | | | | | |
| | 02-306 | 32R11 | 02/13/03 | 1,902 | $5.6000 | 02/13/03 |
| | | | | | | |
| Kent Guymon | 02-318 | 36X17 | 04/15/03 | 4,963.34 | $5.9600 | 04/28/03 |
| | | | | | | |
| | 02-330 | 39X18 | 04/15/03 | 5,170.66 | $5.9600 | 04/28/03 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Landen Guymon* | 02-330 | 39X18 | 04/15/03 | 5,170.66 | $5.9600 | 04/28/03 |
| | | | | | | |
| Leslie Smith* | 02-330 | 39X18 | 04/15/03 | 5,170.66 | $5.9600 | 04/28/03 |

| Name | Contract # | Variety | Date priced | # Bushels Priced | Price | Date Offer to Sell Accepted |
|------|-----------|---------|-------------|------------------|-------|------------------------------|
| Jack Bima | 02-279 | 29X11 | 04/22/03 | 2,476.66 | $6.1300 | 04/28/03 |
|  |  |  |  |  |  |  |

*Leslie Smith is a share participant in Kent Guymon's Contracts No. 02-330 and 02-330-SPEC for variety 39X18. Landen Guymon received a portion of the proceeds under Kent Guymon's Contract No. 02-330 (and possibly 02-330-SPEC), but is not shown on the contract as a share participant. The Seed Grower Pricing Confirmation letter shows that Kent Guymon priced all the delivered bushels on May 2, 2003.  As a result, the record before the Court does not contain a Seed Grower Pricing Confirmation letter for Landen Guymon or Leslie Smith.  Accordingly, the information for Landen Guymon and Leslie Smith in the above chart is taken from Kent Guymon's Seed Grower Pricing Confirmation letter.